Our second case for this morning is Melissa Callahan against the City of Chicago. We'll wait just a second while they clear out. All right, we may proceed. May it please the Court, Thomas Giggin for the plaintiff appellant Melissa Callahan. Our argument comes down to this, that Ms. Callahan as a cab driver, as a common carrier, does have a right, must have a right, under the Constitution or the FLSA or both, in our view, to challenge a policy, decision, practice of the City of Chicago to have cab drivers like her working under sweatshop conditions. That's why we're here. And there are at least two city studies and a study that was submitted in this case by Dr. Bruno that shows how little these cab drivers make on an hourly basis. So let me just put on the table two of the problems that I have with your position. With respect to the constitutional argument that there's somehow been a taking, I don't see how you have presented a ripe claim to us. You haven't asked the state courts to do anything. We have the Williamson County case. The Supreme Court really tries to defer to the state methods for giving just compensation. So that's point one. And point two, for the Fair Labor Standards Act, is I'm having an awfully hard time conceiving of the city as the employer of the cab drivers. And if they're not the employer, if these people are independent business people, albeit in a highly regulated business, I just don't see how you get to first base with the Fair Labor Standards Act. Well, let me take those questions in order. First, the rape-making cases of the Supreme Court go back to the late 19th century. And the granddaddy or grandmother or grandparent of all these cases is Smith v. Ames, which held- You're being asked a question about Williamson County, which is rather more recent and does not entail a case coming from the state court. I was first establishing the constitutional right and then getting to Williamson, Your Honor. But Williamson's about a constitutional right, at least as I understand it. It's a rightness doctrine dealing with constitutional takings claims. But there's no policy. There's no administrative review procedure or any statutory procedure. There sometimes isn't. Sometimes you just have to go to the state court. But this is a legislative act that we're challenging, not an administrative act. Why does that have to do with anything? Because under the circuit court and the procedures for review of administrative actions are set forth under Illinois law by statute. There are no reviews of legislative actions. And that's why- You mean you think if you filed a takings claim in state court, the state court would say, we refuse to adjudicate this claim. Do you have any authority for the proposition that Illinois would simply refuse to adjudicate a takings claim? This is not a takings claim, however. You're making a takings claim here. But the district court analyzed this under the Penn Central cases and pointed out that this isn't a taking. Penn Central is a takings case, although the takings claim in Penn Central lost. That's correct. There was a claim under the taking clause, but unsuccessful. Let me go back to my question. Is there any Illinois authority for the proposition that if you filed a takings case in state court, the state judiciary would refuse to adjudicate? Under the Illinois Constitution. Is there any authority, some case, where a takings claim was filed and the state judiciary said, we can't adjudicate this? No, but there is no administrative procedure act for reviewing a rate case the way there is under a utility or under common carriers. But why does that matter? If the combination of municipal and state law yields a taking, whether it's something simple like we've decided we can build a road across your backyard, or whether it's something that says you have to provide free services to people, or services in your case so far below a remunerative level that they should be regarded as confiscatory. These are all versions of total or partial takings, which is where Penn Central probably comes in. But whether it's under the Illinois Constitution or whether it's under the Fifth Amendment of the Federal Constitution as incorporated by the 14th, the circuit courts in the state of Illinois are courts of general jurisdiction. They can entertain cases that raise constitutional claims, even if it's not somebody going through the administrative procedure of how cab rates get regulated in the city of Chicago. It would be very surprising to me to think that they were divested of jurisdiction over such a claim. I'm not aware of any procedure that has been set out by the General Assembly other than review of administrative actions, and there are always rate-making cases that are being reviewed. Why do you need a procedure? As Judge Wood said, the state court is a court of general jurisdiction. You can go and file a suit there and say, what Chicago is doing is a taking. What do you need more than open jurisdiction in the state court? Well, Your Honor, it's certainly true that the Illinois Constitution- You can file 1983 suits in Illinois courts. We actually see that frequently. That's true. You can use the very same procedure in state court that you've used in general court. I'm not aware of any challenge that has been made under the Illinois Constitution to rate-making by a legislature as opposed to- This is not a challenge under the Illinois Constitution. You're making a challenge under the takings clause of the federal constitution. You're saying that the ordinance and its implementation in Chicago violates the takings clause because just compensation has not been offered. Perfectly standard claim under 1983, and Illinois state courts entertain claims under 1983. That's true. I mean, take the extreme case. Suppose the city of Chicago required anyone who wanted to operate a taxi business to provide one fourth of the rides for free, just because they say this is a public service. You should provide them for free. It seems to me, in that instance, somebody could say, you know, the state is not allowed to compel the services of people. And among other things, that's probably a takings claim, as Judge Easterbrook said, which you could file in a 1983 action in state court. Often they're removed to federal court, but that doesn't have anything to do with the state court's authority. So all of this is to get back to Williamson. You didn't try the state courts to see if you could get any relief there. And the Williamson County case says that a takings claim isn't ripe until the plaintiff has tried whatever, I'm going to say it more generally, but the way I understand it is tried whatever procedures the state makes available. And your position has to be that Illinois makes zero procedures available to get around Williamson County. And I'm having trouble seeing it that way. This was a pro se case originally filed in federal court, of course. Understood. And it is our position that there are zero procedures that are comparable to the review procedures for utility rate determinations. Of course, ironically, you want a federal district court to do this, just not a state circuit court, because there are no more procedures in the federal court for takings. No, that's not true. What we're asking for is that the federal court establish that there is a right to adjust in reasonable rate as to what procedure that the city wants to then apply to determine what that is, so long as it's just and fair under Hope Natural Gas or under Duquesne, the court leaves it undisturbed. So it's our interest, Your Honor, in getting the city to have a procedure. We're not asking for the district court to sign off on what the rate ought to be. And our position is that whatever the rate is, it ought to at least be the federal minimum wage. And that's another leap you take, because her testimony, as I understand it from the damages part of your brief, is that she broke even, and that's how she shows actually what her earnings were, and that the records are a little more than a little sketchy. But she says she broke even, and you're now taking a leap from breaking even, which one could see as nothing's being compensated, you're just breaking even, up to a minimum wage and maybe not even the $8.25 minimum wage, because I'm not sure that gets you above the poverty line. Minimum wages are pretty low at this point. Yes. Well, whatever it is, it has to be at least that the city of Chicago now has a regulation. Why? Why does it have to be, though? Why does it have to be? It seems to me a lot of people run their own little business, and they spend a lot of hours in their businesses. And if you divide what they earn by the number of hours they spend, I bet a lot of them don't make the minimum wage. That's too bad. I'm not saying I think this is a great thing, but I think it's common. Your Honor, I'm not sure that's true. But where's the law? Well, it certainly is true about restaurants. No businesses land in bankruptcy more frequently than restaurants, most of which are independent businesses, and many of which they can't be making a minimum wage or they wouldn't be defunct. And on your same theory about why cab drivers are city employees, you would say all restaurant waitresses, managers, and so on are all city employees because the city of Chicago couldn't flourish if it didn't have restaurants. That's not our argument, Your Honor, and I think that's not an accurate description of it. The city is liable under the FLSA because the city, unlike the restaurant situation, prescribes the manner in which the cab drivers do their work. I don't think you've looked recently at the level of detailed Chicago regulation of restaurants. It's really extensive. I understand that it's extensive, but not so extensive that they discipline people in administrative courts for courtesy or lack of courtesy, and it is not so extensive as to require a kind of common carrier obligation that is unique to the taxi industry. The question is if you look at... Restaurants are viewed as places of public accommodation. But the city does not prescribe the compensation of the employees, and under the Illinois statute, the city has... It doesn't prescribe compensation to taxi drivers either. It has authority to prescribe compensation. That's what 65 ILCS 1142 says. No, it prescribes fares. It doesn't prescribe compensation, either gross or net. Your Honor, if you look at the statute, it says prescribe compensation. Well, it does prescribe fares, and actually part of this issue has been customers often tip as well, so the compensation is quite commonly not limited to the fare. But I want to go back to the more basic question. But the FLSA doesn't apply to... You're saying because this is heavily regulated, and I will grant you that it's heavily regulated. Even to the point of prescribing compensation. The city is the employer, and that's a jump. I mean, I don't see how that makes the city the employer. There used to be a lot of regulated industries whose price for kilowatt hours of electricity was regulated, whose price for water was regulated, and they weren't all part of the city. Your Honor, there's no other industry that I know of that I can point to that plaintiff is aware of where the city has the statutory authority to prescribe compensation. It's not set the fare, but prescribe compensation, where the city, as the district court found below, controls the manner in which the employees perform their work, where there's a common carrier obligation performed, where the Supreme Court has said that the plaintiff in a common... that a public utility in a common carrier follows under the same law, is a, to quote Duquesne Light, is a partly private, partly public venture. It is a partly public venture. The business Miss Callahan is in is in a partly private, partly public venture, and the public is the city. It's a partly city venture that she's engaged in. How about lawyers? Move to the state context. I'm sorry, Your Honor. Move to the state context. How about lawyers? They're partly private, partly public. They do public service. They're very heavily regulated by the state in all aspects of their behavior. Lawyers are not common carriers. Their compensation is not prescribed under Illinois law, so far as I know. Actually, state courts regularly prescribe what lawyers can make, not only for public defenders, where there's a prescribed hourly rate, but you can't charge a contingent fee without the court's approval, which will set a cap on what you can charge, and so on. And that's probably to prevent gouging and so forth. But this is a case where the city is prescribing compensation, and lawyers are not common carriers. There is a distinct difference between those people who are in partly private, partly public ventures and people who are working just for themselves, as lawyers are. So you think the state can limit how much an attorney can get paid in certain contexts, and that's all right. But the city can't limit how much a tax driver can get paid for a certain fare, and that's not all right. In certain contexts, the court is acting as a fiduciary for people who are not in court, say in a class action, a contingent fee situation, or protecting the plaintiff. But it's not literally prescribing what the hourly rate that Sidley & Austin can charge, or the hourly rate that Kirkland & Ellis can charge, or the hourly rate of DePray, Schwartz & Gagin. It's not in that business, and would be astonished to find itself in that business. It is a different kind of venture that is partly, as I keep saying, partly private and partly public, and I think that that is the distinction between that and what lawyers do. There's the state statute which says we prescribe the compensation, and the city comes forward and says, well, we're just a regulator, and why should we be responsible under the FLSA for compensation? Their only regulatory authority, as they said in Campbell v. City of Chicago, came before this court in 1987, and said our only regulatory authority for purposes of limiting licenses and everything else is because we have the right to prescribe compensation, and we want to have fair compensation. Now they're coming forward and saying, well, that doesn't matter, and in a certain sense everybody's dependent upon the government. Not in this same way. I think that the analogy is not fair or true or fair for these people who are making, as Ms. Callahan reports, 12,000 a year from working full time. This is a situation for which the city's fair is directly primarily as a matter of economic reality, and I know that, Your Honor, Judge Easterbrook, you like economic reality. The economic reality here is that these people are dependent upon the city in a way that others aren't, and to ignore the statute that says we're prescribing compensation, regulatory authority, and to ignore the nature of this common carrier obligation that they have, and the enormous benefit that these individuals do for O'Hare, Midway, which couldn't function without them, McCormick Place, as a form of public transit in this city, say the city can wash their hands of them, under the FLSA, which standard is suffer or permit to work. Well, the city suffers or permits these people to work under the minimum wage because it's directly regulating their compensation under 65 ILCS 114 whatever it is, and that brings them well within the FLSA in a way that is quite different from the restaurant business. I think the analogies aren't accurate. Okay, anything else? Well, I want to just briefly mention that the damage point that- If you want to save further remarks for rebuttal, that would be fine. I mean, obviously, you've briefed damages, so we know what your position is. Mr. Breyer. It's a silent R. It always gives grief. Yes. May it please the court, this court should affirm the judgment of the district court. Starting with this court's questions regarding the Illinois court's powers in this regard, the observations of the panel were correct. The Illinois courts possess broad powers. As the Illinois Constitution sets out, it's broadly power over basically any justiciable matter, excluding moot issues, things of that sort, but it's extremely broad power. 1983 claims, a takings claim could be brought in state court, could be resolved. I see no need for a specific grant of the legislature to give the circuit court's jurisdiction when the Constitution already provides that jurisdiction in the first instance. Just turning to the merits of the takings clause. I take it, though, that no such takings claim, whether in this case or any other case, has ever been brought in the circuit courts about the structure of the price regulation in the taxi industry. What about other regulated industries? None that I know of in the taxi industry. I can't speak to other industries. I apologize for that, but nothing in this case challenging the city's taxi rates as an unlawful taking or requesting any sort of compensation from the city to make up for that supposed taking. Nothing to my knowledge. Suppose the city were to pass an ordinance saying that effective January 1, 2016, electricity has to be sold in the city for one half of whatever the price per kilowatt hour was on January 1, 2015. I'll just assume that might be a confiscatory rate. Do you think that Exelon or ComEd or whoever the right entity is could file a takings claim? I believe they could file. Obviously, whether it succeeds is a substantive question beside the point. I don't want to venture into that, especially I'm not going to claim knowledge of those sorts of rates. But I believe they could file. There's nothing in the Illinois Constitution that would prevent it. There's nothing at all that I know of in any statute. And opposing counsel hasn't cited anything either. Administrative procedure doesn't seem even remotely appropriate here as a limitation, even if that were different. That's just not what we have here. It's not that sort of administrative rate that you would go through, for example, the city's Department of Administrative Hearings for review or anything like that. So I believe that there's absolutely no bar to someone bringing such a claim in Illinois state court. So let me rephrase Mr. Gagin's FLSA argument, because I understand him. He's essentially saying, you know, if it looks like a duck and quacks like a duck and flies like a duck, it's a duck. And if the city is prescribing behavior on the job and is prescribing how much people can earn, at least in terms of the stated fare that comes up on the meter, and it's prescribing the cost of the most important input by regulating how many medallions are out there and so on, that it is the employer, even if it hasn't chosen to label itself as the employer. That's what I understand him to be saying. That seems a fair characterization of their argument. And we believe that that entire argument is foreclosed by the rationale of this court's decision in Van Skuyck, that this sort of government action is just of an inherently different nature than an employer's regulation of an employee, of an employer's control over the employee's wages, of control over their hours. No, it's the state, by the way, isn't it, that issues the chauffeur licenses, not the city? The city issues both the chauffeur licenses and the medallions. That's, as I understand it, it's an exercise of the city's overrule. So the state issues your driver's license. Right. But then you go to the city for the chauffeur license. Yes, those provisions are set out in the municipal code and various regulations that have been promulgated by the city. But the nature of that authority, this court pointed out in Van Skuyck, in a different context, was that absent the sort of free labor exchange, doesn't have to be compensation. Obviously, an unpaid intern could still be an employee that's been seriously litigated. But it's still this sort of negotiation where the only thing binding the parties is what they've agreed to, that sort of exchange. And that's just not present when it's regulation of this sort. It doesn't have anything to do with the extent of the regulation. Opposing counsel has characterized this as saying, oh, if we just regulate a lot, then that's okay. That's not the point. It's not the amount of regulation. It's the inherent nature of the relationship between the alleged employer and the alleged employee. So how important is it for your argument that once this chauffeur's license, which isn't really, as I understand, all that hard to get, you know, a certain amount of training is issued, it's up to the holder of that license to decide how much taxi service to offer, basically how many days or how many hours in a day or any of those other details? We believe that's of great significance. We don't mean to give any undue weight to any particular factor. The Department of Labor has recently cautioned against that. But when, you know, one of the key factors under the control element of the economic reality test is whether the level of control shows basically that the employer and employee are one economic unit, that there's no independent economic identity of the so-called employee. If the employee has free reign to pick when to work, how to work, where to work, whether to work at all. You know, Callahan even chose to just give up on taxi driving as a general matter with no feedback from the city. There were no consequences. The city didn't didn't say you have to meet a quota. You have you have this license. You need to use it or we're going to give it to someone else. There was nothing of that sort. Everything that she did indicated that she was a freestanding economic unit, a freestanding small business. And the evidence in the record suggests, though, that her experience was quite typical. I mean, that it's actually very hard to, let's say, break through the federal poverty line if you are working full time as a taxi driver. So that's that's a little bit disturbing. Is the city, does the record show whether the city is experiencing any decrease in applicants for chauffeur licenses or any lesser interest in medallions in this era of Uber, etc.? The record, I believe, is silent on that. I do not recall anything. There might be some something outside the record that indicates that. It wouldn't be surprising, but I can't say one way or the other. Typically, when someone enters a market, it alters those demand structures. But I can't speak to how that's changed, particularly given that Uber, Uber has its own problems. Obviously, there there is issues with whether they are employers, whether they owe their employee their driver's minimum wage. So there are a lot of complicated issues there regarding regulation that I just don't know how they affect that. But a decrease would not be surprising in the demand for for licenses. But again, just can you tell me any other regulated industry where the government regulates the maximum amount an employee can be paid or individual can be paid? I'm going to use the term per task, not maximum compensation. An employee or an individual does a task and the government says, all right, for that task, this is the most you can be paid. Is there any other regulated industry you can think of where that happens? I'm not aware. The closest analogy I might offer would be perhaps rent control. A person can only rent a certain either rental if you consider the rental of a unit. A task rental controls are very standard. They're not they've survived numerous constitutional challenges under under Penn Central. That would be the closest analogy I can think of right now that you can rent this apartment per month. You can't charge more than X or a certain percentage. I'm not sure exactly. I'm sure different municipalities have different ways to calculate what the acceptable rate would be. That's the closest I could come up with the example of lawyers as well. Slightly more imprecise because there's no specific you can charge X. It's broad ethical guidelines, guidelines on how you charge contingent fees, for example. Contingent fees plus hourly fees have other issues. Sure, but a lawyer isn't told you can only charge X amount for drafting a will or Y amount for doing a real estate transaction. Right. And that's why that's why I said it was it was an imprecise that there's a there is a cap. It's just it's not it's not a bright line. It's a fuzzy line. I guess I would say there are other markets in which if one chooses to participate in the market, the remuneration is quite limited. And I'm thinking, for example, of doctors who decide to participate in the Medicare system or Medicaid. There's a whole schedule of procedural compensation rates that if you were to take an informal poll among doctors, I think you would you would hear that these are very, very stingy rates indeed, and maybe not remunerative. Correct. I've often hear complaints from from doctor friends about not wanting to participate in certain programs because of those limits. But some have exited, as a matter of fact. Exactly. And some refuse to take such patients. Yeah, that seems to be a common complaint among among those professions that have those sorts of limitations. But no one would say that their economic. That's the crucial the crucial point here, that no one would say those doctors' economic identity has been subsumed by the government. Well, they're not regarded as employees of the federal government. That's correct. Right. And whoever, if they are employees at all. Yeah. Right. And there are other restrictions on doctors. They can't certain ethical restrictions regarding how they interact with pharmaceutical reps and things of that nature. And nobody would say that. That's a that's a very strict bright line control. And again, as you as you noted, nobody would say that the doctors are employees. And that's this whole case, I think, really illustrates why the illustrates both problems with the illustrates the problems with the economic reality analysis that I think Van Skuyck was really trying to hit on. Can you can even see this in the district court's opinion? You can see these factors. The district court even commented that these factors don't seem to really work to describe the kind of relationship we're talking about here. Well, the district court does its best after making an editorial comment to go through the analysis described in our 1987 decision in Secretary against Lauritsen. We have often commented that multifactor tests are difficult to for anything except perhaps, you know, a checklist to make sure that you didn't forget to think about something. But they don't tell you any weights. If you were to weight the things that Lauritsen talks about, how would you weight them? I would probably I would probably start with control because I think that's the biggest problem for Callahan's complaint. And I think all the factors ultimately work in the city. Some are a bit strange fits for this sort of claim. But I think they all if there was a thumb on the scale, I think they all go that way. But I think control is the most damaging to her case because, again, the kind of control Callahan keeps referring to what she calls employer type control and doesn't define that term. Well, how much we're going to pay you, I mean, I think is a pragmatic sense. That's usually what your employer says. You know, we're going to pay you X dollars per year to be a lawyer for the city of Chicago. And, you know, you may negotiate it a little bit, but ultimately there's there's a salary, right? Right. But the city doesn't do anything reaching that level. As Judge Bruce pointed out, there's there's some questions whenever there's a fuzzier line that it's not the same. And we have that sort of fuzzy line here. The city doesn't prescribe taxi drivers compensation. They set maximum fares. That's it. There's they set what the taxi driver can charge. Don't they set the number of hours at this point that they can drive? You know, nobody's supposed to be driving for 20 hours a day, right there. I thought there were some safety regulations about the number of hours. There are safety regulations regarding I believe it was 24. It's it's extremely long, particularly for driving a passenger around the around the city. But that's hardly unique for the city to do that. The federal government has restrictions for cross for interstate truckers, if memory serves, that they can't drive for more than a certain amount of time. I mean, that's that's a public safety hazard. And as we know, that that'd be questionable, whether even absent the city's regulation, that driving passengers after Calhoun admits 96 hours without sleep wouldn't fall, wouldn't fall under the general prohibition against reckless driving. That just seems seems absurd to believe that that is something that the city has overstepped its bounds by trying to protect the citizens of the citizens and visitors to Chicago by preventing. I just I'm just not seeing that. But again, these regulations, they don't break down the independent economic identity that these taxi drivers have. There's evidence in the record undisputed of taxi drivers that exercise their own unique judgment on how they go about drawing in customers. Again, a factor under the Lawrence and test exercising their judgment, how to draw, how to increase customer volume, how to get their their message out to customers, to bring people in, to get people in the taxi. They have free rein to do that. Calhoun chose not to do that. And that's she can't be faulted for that. That's not a that's not a failing, but it's just something she didn't do. It's not because she was prohibited from doing it. It's because she was given a choice and she made a choice that in hindsight she's not happy with. But there was a choice. There was definitely a choice here. Although evidence in the record that those extra efforts don't amount to much extra in compensation. If you're one of the expert reports, if you're referring to the Bruno report, that report, as we know, at some length has serious, serious problems. Most notably, I think not just the the use of averages to completely alter the range that that is shown of the various income, but also that Dr. Bruno admitted he doesn't know what some of the terms he was trying to draw conclusions from mean. He doesn't know what charges are. He said charges. I'm I'm guessing it means tips, but he doesn't know. There's nothing one way or the other. He just guessed. And that's certainly not a basis for an expert report. That's a troubling, very troubling basis for an expert report to just take a guess at what the data might mean and then draw a conclusion that these drivers have no, no economic opportunities whatsoever. That's just a humongous leap. And we believe the district court erred in considering any of that report. Dr. Bruno himself admitted he didn't believe it was publishable material because the way it was compiled, didn't know how many drivers, how many drivers he surveyed. He just had raw data. He didn't know if they were different drivers or the same driver submitting multiple times. So there is that in the record, but we believe it absolutely cannot be considered. If this court has no further questions, we'll rest on our briefs and respectfully request that you affirm the judgment of the district court in all respects. Thank you. Anything further, Mr. Gagan? I'm thinking the answer is yes. I would just note by comparison of the taxi industry, people who work in restaurants in this city and in fact in any kind of occupation now get $10 an hour. We're talking about a class of individuals whose rates are set by the city who has, according to this court, in Campbell versus City of Chicago, is acting to prescribe fair compensation for the drivers, saying that they don't have any responsibility for that under the FLSA, notwithstanding the fact that the district judge made two findings below. Number one is yes, these drivers are economically dependent upon the city. How can they not be? And number two, yes, the city, the most important factor of control, city attorney just said, the city controls the manner in which they perform their work. And the final economic reality factor here is that taxi service is indispensable. The city says it's not our business. Then fine, let the city abandon taxi service and let us all have Uber and Lyft. No, these are common carriers who are performing a quasi-public function, which is a quasi-city function, and assisting, contributing enormously to the operation of two of the biggest businesses that are in this Seventh Circuit. Number one, O'Hare Airport. Number two, Midway. And I don't even have to go to McCormick Place or Navy Pier, which are jointly run by the city and the state. Those businesses can't operate without common carrier taxi service, which this defendant has put in place with elaborate regulations because there are no actual employers anymore. And it's clearly a sense where these individuals are working at least partly for the city in what is partly a city venture, as is established in case law that goes back to the 19th century for common carriers. And the claim that the Bruno study is flawed because it doesn't really show how bad things are, it doesn't really know certain things. The city has two separate studies which show that thousands of drivers are not clearing the minimum wage, not clearing 8.25 an hour, and in many cases in negative numbers. These people are the dispossessed, and they have been given no right, despite the fact that the city has total control over how they perform their jobs and their compensation, to come before the court and say that the city is suffering and permitting them to work, which is a standard. It's not hiring them, it's not sending them out on missions. Suffering and permitting them to work when they have the power, the city, when the city has the power to hinder a sweatshop-type condition, total power, and isn't exercising it. That's what our case is, and it's just hard to believe that this one group of employees in the city of Chicago, and they are employees, they are working for the city in a sense, and only they are consigned to sweatshop conditions under the FLSA. It's not right, it's not the law, it's wrong. The city has a lot of options about what it ought to do, but continuing this is not an option. All right, thank you very much, Mr. Kagan. Thanks as well to the lawyers from the city. We will take the case under advisement.